IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DUSTIN BUXTON,

    *Plaintiff*,

    v.

    Civil Action No. ELH-14-2836

SANDRA KURTINITIS, *et al.*,

    *Defendants*.

**MEMORANDUM**

Plaintiff Dustin Buxton filed suit against five employees of the Community College of Baltimore County ("CCBC"), in their official and individual capacities, pursuant to 42 U.S.C. § 1983. In his Complaint, to which exhibits are appended, he alleges violations of the Free Speech Clause ("Count I") and the Establishment Clause ("Count II") of the First Amendment to the United States Constitution, as well as a violation of the Equal Protection Clause of the Fourteenth Amendment ("Count III").

According to Buxton, defendant Adrienne Dougherty, Program Director and Coordinator of the Radiation Therapy Program ("RTP") at CCBC, *id.* ¶ 11, violated his rights "by denying [him] admission to [the RTP] on the basis of his expression of his religious beliefs and viewpoint" during the admissions process. *Id.* ¶ 71. Further, Buxton alleges that defendant Sandra Kurtinitis, President of CCBC, *id.* ¶ 9, violated his rights when she "refused to correct" Dougherty's decision. *Id.* ¶ 73. Defendants Charles Martino, Academic Advisor for the School of Health Professions, *id.* ¶ 12, and Ebony Thomas, Coordinator for Selective Admissions for the School of Health Professions, *id.* ¶ 13, allegedly violated Buxton's rights by "endorsing and approving" Dougherty's decision. *Id.* ¶ 72. In addition, Buxton alleges that defendant Carol Eustis, Dean of Instruction for the School of Health Professions, *id.* ¶ 13, violated his rights "by

refusing to correct Defendant Dougherty's decision … and by placing … [an] 85 year 'Dean's Hold' on Plaintiff's academic status." *Id.* ¶ 75.

Defendants have moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).  *See* ECF 17 ("Motion"); ECF 17-1 ("Memo").  Buxton opposes the Motion, ECF 20 ("Opposition"),[1] and defendants have replied.  ECF 21.  Buxton also filed a Motion for Leave to File Sur-Reply, ECF 22, which defendants oppose.  ECF 23.  Plaintiff has replied.  ECF 24.

The motions have been fully briefed, and no hearing is necessary to resolve them.  In order to ensure a full and fair consideration of the parties' arguments, I will grant plaintiff's Motion for Leave to File Sur-Reply.  And, for the reasons set forth below, I will grant in part and deny in part defendants' Motion.

## I.   Factual Background

Buxton's claims are related to those raised by plaintiff Brandon Jenkins in a case also pending in this Court, captioned *Jenkins v. Kurtinitis*, ELH-14-01346 (D. Md. filed Apr. 21, 2014).[2]  Buxton and Jenkins are represented by the same lawyers, and all of the defendants in both cases are also represented by the same attorneys.

In *Jenkins*, the plaintiff alleged that Dougherty violated the Free Speech and Establishment clauses of the First Amendment, as well as Article 36 of the Maryland Declaration of Rights, by denying him admission to the RTP based on faith-related statements he made in his admissions interview.  *See* ECF 1.  Jenkins also alleged that Kurtinitis, along with two other CCBC employees who are not named in this action, Mark McColloch and Richard Lilley, violated his rights by "endorsing and approving" Dougherty's decision.  ECF 1 ¶ 61.

---

[1] Curiously, plaintiff's counsel filed a Rule 56(d) Declaration, although defendants did not move for summary judgment.

[2] All of the defendants, except Dougherty, have been dismissed from the *Jenkins* case. *See* ELH-14-01346, ECF 28 (Memorandum); ECF 29 (Order).

The defendants in *Jenkins* moved to dismiss all claims, pursuant to Fed. R. Civ. P. 12(b)(6); their motion was very similar to the Motion *sub judice*.   *See* ELH-14-01346, ECF 23; ELH-14-02836, ECF 17.   In *Jenkins*, I granted in part and denied in part the motion to dismiss. *See Jenkins v. Kurtinitis*, ELH-14-01346 (ECF 29), 2015 WL 1285355, at *39-40 (D. Md. Mar. 20, 2015).   In particular, I denied the defendants' motion with respect to Jenkins's Establishment Clause claim against Dougherty, in both her official and individual capacities, and his claim against Dougherty in her individual capacity, under Article 36 of the Maryland Declaration of Rights, to the extent it mirrored Jenkins's Establishment Clause claim.   But, I limited Jenkins's Establishment Clause claim against Dougherty in her official capacity to prospective, injunctive relief only, pursuant to 42 U.S.C. § 1983 and the Eleventh Amendment.   As to all other claims, I granted the defendants' motion, with prejudice.

As stated, Buxton's claims are very similar to those of Jenkins.   Buxton's claims hinge, for the most part, on the following allegations, ECF 1 ¶¶ 27, 28 (alterations added):

> 27.   Mr. Buxton recalls that early in the [2013 admissions] interview, the panelists asked him the broad question, "What do you base your morals on?" Mr. Buxton simply answered, "My faith."   Mr. Buxton made no other mention of his faith or religion.

> 28.   Nonetheless, in a written review of Mr. Buxton's interview, Defendant Dougherty stated that Mr. Buxton had lost points on his interview score because, "He [Mr. Buxton] also brought up religion a great deal during the interview.   Yes, this is a field that involves death and dying; but religion cannot be brought up in the clinic by therapist or students."

Buxton further alleges that Dougherty "is responsible for overseeing and coordinating the processing of applications for the [RTP], as well as academic advising, testing, evaluation, and admissions to the program." *Id*. ¶ 11.   He included as an exhibit to his Complaint a copy of the evaluation of his 2013 application written by Dougherty.   *See* ECF 1-3 at 6; ECF 1 ¶ 45, 28

(alleging Dougherty authored evaluation).  The evaluation states, in its entirety, as follows, ECF

1-3 at 6 (emphasized included in the Complaint):

> The student did not receive very good feedback from his observation day.  He told one of the therapists that he assumed he was guaranteed a spot in the program. He did state that he seemed like a bother to some of the therapists; however they felt he asked questions at inappropriate times, interrupting them at times, and were related to the engineering aspect of the field.  In addition, the therapists said that he wrote down/typed everything they said.  It was also noted that during a simulation procedure in which IV contrast was injected, he stated something along the lines that he did not sign on for this.  This is minor, but the student did not follow directions when asked to initial the admissions process.   When responding to questions in the written sample, he did not fully read the questions and respond to them in the role of a student.  The interview committee felt he was not a good fit for this field.  His answers to several of the questions were very textbook and lacked interpersonal skills.   When asked about important characteristics that a therapist should have he responded 'not to socialize or fraternize' and then in the next sentence he brought up a sense of levity and that it is good to laugh.  *He also brought up religion a great deal during the interview. Yes, this is a field that involves death and dying; but religion cannot be brought up in the clinic by therapist or students*.  He mentioned plans to go onto complete a Dosimetry Program, but I do not think he has researched this career path fully. University of Maryland does offer a 1-year program, but they receive approximately 100 applicants and have only 2 seats available.   Physics and Dosimetry may be a possible career path for him, but he lacks the interpersonal skills for this field.  If this is something he wants to continue to pursue, I would suggest at least a full week of observation at another facility.  His pre-requisite grades could be more competitive (18/30).  Linda Brothers may be able to assist with his interpersonal skills.

Buxton also asserts that there is a "pattern and practice of discrimination against students'

expressions of religious beliefs and viewpoints" by CCBC officials.  ECF 1 ¶¶ 75, 83.  In support

of his assertion, Buxton expressly incorporates some of the facts alleged in Jenkins's Complaint

into his own Complaint.  *See id.* ¶¶ 42, 43.  In addition, Buxton complains about a "Dean's

Hold" placed on his school account two weeks after his attorneys sent a letter to CCBC outlining

his concerns, which temporarily prevented him from registering for a class.  ECF 1 ¶¶ 52-56.

Buxton places blame for the "Dean's Hold" on Eustis.  *Id.* ¶ 74.

Additional facts are included in the Discussion.

## II. Discussion

Defendants' Motion is predicated on Fed. R. Civ. P. 12(b)(6).  I incorporate here the applicable standard of review, set forth at length in *Jenkins*, 2015 WL 1285355, at *5-7.

In my view, Buxton's Free Speech and Establishment Clause claims against Dougherty and Kurtinitis are essentially indistinguishable from those brought by Jenkins against the same defendants.  And—*except* for Buxton's claim with respect to the "Dean's Hold"—Buxton's First Amendment claims against Martino, Thomas, and Eustis are indistinguishable from Jenkins's claims against McColloch and Lilley.  Accordingly, as to these claims I reach the same decisions here as I did in *Jenkins*.[3]  I will address each Count in turn.

### A. Count I

Buxton claims, *inter alia*, that defendants violated the Free Speech clause by denying his admission to the RTP for the 2013 and 2014 Fall semesters because he talked about his faith in his 2013 admissions interview, ECF 1 ¶¶ 71, 72, 73, 74.  Buxton's claims fail for the exact same reasons Jenkins's claims failed.  As in *Jenkins*, the speech at issue here was expressed only during an admissions interview.  ECF 1 ¶ 27.  And here, as in *Jenkins*, it was not speech on a matter of public concern.  *Id.*; *see also* 2015 WL 1285355, at *24.  Indeed, here, as in *Jenkins*, "[p]laintiff himself expressly argues in his Opposition that the speech at issue was 'private' speech."  2015 WL 1285355, at *24; Opposition, ECF 20 at 7-8.

What I said in *Jenkins* applies here, 2015 WL 1285355, at *25 (alterations added):

> Framed as a retaliation claim, plaintiff fails to state a claim because the Free Speech Clause does not protect speech expressed in an admissions interview

---

[3] Because the two cases are related, I need not repeat the extensive analysis of the issues previously set forth in *Jenkins*.

from admissions consequences in a competitive process, *i.e.*, denial of admission based on the content or viewpoint expressed. *See, e.g.*, [*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585-86 (1998)]; [*Association of Christian Schools International v. Stearns*, 679 F. Supp. 2d 1083, 1097 (C.D. Cal. 2008), *aff'd*, 362 F. App'x 640 (9th Cir.), *cert. denied*, 131 S. Ct. 456 (2010)]. Framed as a challenge to CCBC's admissions criteria, plaintiff fails to state a claim because the Free Speech Clause does not prohibit CCCB from taking into consideration the content or viewpoint of an applicant's speech when deciding which candidates to admit to a competitive educational training program. *Id.* Moreover, even assuming the Free Speech Clause provides special protection in the admissions context for speech on a matter of public concern, the Complaint fails to state a claim for relief because Jenkins's speech did not involve a matter of public concern. *See* ECF 26 at 14; [*Durham v. Jones*, 737 F.3d 291, 300 (4th Cir. 2013)].

Therefore, for the reasons explained at length in *Jenkins*, 2015 WL 1285355, at *10-25, incorporated here, I will grant defendant's Motion as to Buxton's claims in Count I that defendants violated the Free Speech Clause by denying Buxton's admission to the Fall 2013 and Fall 2014 Radiation Therapy Program because of what he said in his admissions interview.

Buxton's claim that Eustis violated the Free Speech Clause by placing a "Dean's Hold" on his school account, in retaliation for Buxton's protests about his denial of admission to the RTP, is of course quite different. ECF 1 ¶ 74; Opposition, ECF 20 at 13. It concerns speech made in response to his rejection for admission, outside the context of the admissions interview. *See* ECF 1 ¶¶ 52-56.

As set forth in *Jenkins*, in order to state a claim for retaliation under the Free Speech Clause, Buxton must allege facts plausibly showing that "(1) [h]e engaged in protected First Amendment activity, (2) the defendan[t] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (alterations added); *accord Raub v. Campbell*, 785 F.3d 876, 885 (4th Cir. 2015); *see also Suarez Corp. Industries v. McGraw*, 202 F.3d 676 (4th Cir. 2000). Buxton

alleges that, approximately two weeks after he issued a letter to Kurtinitis and Dougherty outlining his belief that he had been denied admission to the RTP "for religiously discriminatory reasons," ECF 1 ¶¶ 49, 50; ECF 1-3 at 1 ("Demand Letter"), he was unable to register online for a class in the next semester, because a "Dean's Hold" had been place on his account.  ECF 1 ¶¶ 52-54.  "Under 'Reason' for the Hold, Mr. Buxton was instructed to 'meet with L. Mehan [sic] OR S. Eckhardt,'" *id.* ¶ 55, both of whom are CCBC employees in the Office of Judicial Affairs. *Id.* ¶ 56.

Buxton provides no factual support for his bare conclusion that Eustis placed the Hold, other than his allegation that her title is "Dean of Instruction for the School of Health Professions."  ECF 1 ¶ 10; ECF 20 at 13.  In light of Buxton's allegation, taken as true, that the Hold directed him to meet with persons in the Office of Judicial Affairs, rather than with Dean Eustis or even someone in the School of Health Professions, it is possible—but not plausible— that Eustis placed the Hold on Buxton's account.  Consequently, the Complaint does not plausibly allege that Eustis "took some action that adversely affected [his] First Amendment rights".  *See Constantine*, 411 F.3d at 499; *Twombly,* 550 U.S. at 570.

Further, even assuming that Eustis placed the Hold, there are no facts alleged to show that Eustis knew of Buxton's protected speech before taking action, or that she placed the Hold because of Buxton's protected speech.  Buxton alleges that Eustis placed the Hold "'merely because [Buxton] protested Defendants' systematic repeated violation of his rights.'"  ECF 20 at 17 (quoting ECF 1 ¶ 74).  But, he does not allege that Eustis was aware of the Demand Letter that he sent to Kurtinitis and Dougherty two weeks before the Hold appeared.  He asks the Court to infer Eustis's awareness of the speech at issue from his conclusory allegation that Eustis placed the Hold because of the speech at issue.  ECF 20 at 17.

In my view, the Complaint fails plausibly to show that Eustis placed the Hold, or that the hold was placed in response to Buxton's protected activity. *See, e.g., Twombly*, 550 U.S. at 680-81 (stating that allegation defendant "'knew of, condoned, and willfully and maliciously agreed to subject [him]' to harsh conditions" was conclusory and "not entitled to the assumption of truth") (quoting record); *Constantine*, 411 F.3d at 501 ("[To] allege a causal connection between her First Amendment activity and the alleged adverse action, … a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.").

However, Buxton may be able to cure both of these defects with additional factual allegations. Therefore, I will dismiss the claim, but grant leave to amend.

## B. Count II

Buxton claims that Dougherty, in her official and individual capacities, violated the Establishment Clause by denying his admission to the RTP in both 2013 and 2014 because of the faith-related statements he made in his 2013 admissions interview. As to this claim, I will deny the Motion.

"'To pass muster under the Establishment Clause, government conduct (1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle* church and State.'" *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 608 (4th Cir. 2012) (emphasis in *Moss*). In *Jenkins*, 2015 WL 1285355, at *29-33, I determined that the plaintiff alleged facts sufficient to show plausibly that Dougherty acted with an impermissible purpose when she denied Jenkins's admission to the RTP. To be sure, it was a close call. Jenkins alleged that Dougherty provided him with a number of reasons that his admission was denied, most unrelated to his statements in his

admissions interview.  But, at the motion to dismiss stage, the court generally must assume the truth of the allegations.  And, Jenkins alleged facts that, taken as true, plausibly showed that at least one of those reasons was false or pretextual.  Thus, it appeared plausible—however unlikely or improbable, *Twombly,* 550 U.S. at 556— that Dougherty acted unlawfully.  *See Jenkins*, 2015 WL 1285355, at *32-33.

In this case, Buxton's claim with regard to Dougherty's purpose is even thinner than Jenkins's claim.  As in *Jenkins*, Buxton has provided the Court with certain documents, attached to his Complaint, that shed light on CCBC's  understanding of the facts at issue.  ECF 1-3; ECF 1-4; ECF 1-5; ECF 1-6.  Notably, he has included the complete text of the 2013 internal evaluation written by Dougherty that gave rise to his Complaint.  ECF 1-3 at 6.  It contains the religion-related statement alleged in the Complaint, ECF 1 ¶ 28, but it also contains a number of other reasons explaining why, according to Dougherty, Buxton did not do well in his interview, and/or would not be a good fit for the RTP.  ECF 1-3 at 6.  They are secular reasons for Buxton's rejection and, if not pretextual, would be legitimate reasons for Buxton's rejection.  *See*, *e.g.*, *id.* ("It was also noted that during a simulation procedure [during Buxton's observation day] in which IV contrast was injected, he stated something along the lines that he did not sign on for this.").

However, as in *Jenkins*, in the present posture of this case, I must accept as true Buxton's factual allegations, and draw all reasonable inferences in his favor.  This means I cannot credit defendants' assertions, contained in Buxton's Complaint, *see* ECF 1 ¶¶ 38, 39, and in the documents attached to the Complaint, *e.g.* ECF 1-5 (CCBC response to Demand Letter), that Buxton was not admitted because he was not regarded as a good fit for the program and because other candidates were more qualified.  Moreover, in light of Buxton's allegations that both he

*and* Jenkins lost points in their interviews, and were not admitted to the RTP program by Dougherty because of their faith-related statements, it appears that Dougherty may have taken such statements into consideration.  Thus, even assuming she had a secular purpose for taking Buxton and Jenkins's faith-related statements into consideration, it is plausible that such a pattern of decisionmaking may have the primary effect of disapproving of religion.  *See*, *e.g.*, *Mellen v. Bunting*, 327 F.3d 355, 370-76 (4th Cir. 2003) (holding that supper prayer at Virginia Military Institute had the "primary effect of promoting religion" because it sent the "unequivocal message that VMI … endorses the religious expressions embodied in the prayer", "[r]egardlesss of the purposes motivating it").

Therefore, I will deny the Motion with respect to Count II as against Dougherty.  But, pursuant to 42 U.S.C. § 1983 and the Eleventh Amendment, and for the reasons described in *Jenkins*, 2015 WL 1285355, at *7-10, Buxton's claim for relief against Dougherty in her official capacity must be limited to prospective, injunctive relief.  *See also* Reply, ECF 21 at 1-2.  And, I will dismiss Buxton's claims against the remaining defendants in their official capacities, with prejudice, because they merely duplicate his claim against CCBC, which is brought via his claim against Dougherty in her official capacity.  *See Jenkins*, 2015 WL 1285355, at *35.

In defendants' Reply, they argue that all claims for damages against defendants in their individual capacities must be dismissed because the "actions alleged to have been taken by each of the defendants are inextricably tied to their official duties at CCBC", and, therefore, Buxton's "claims against the defendants in their individual capacities are actually claims against the State", and his request for damages is barred by the Eleventh Amendment.   ECF 21 at 3. Defendants cite only *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014).  In his Sur-Reply, ECF 22-1 at 2, Buxton correctly points out that *Martin* concerned the Fair Labor Standards Act, not 42

10

U.S.C. § 1983, and notes that the Supreme Court made clear in *Hafer v. Melo*, 502 U.S. 21, 31 (1991), that § 1983 plaintiffs can pursue claims against state officers in their individual capacities for damages arising from official acts.

Accordingly, I am not persuaded that any of Buxton's individual capacity claims for damages must be dismissed under the rule set forth in *Martin*.   Nevertheless, with respect to Buxton's claims that the remaining four defendants' decisions, in their individual capacities, "to approve and uphold" Dougherty's decision violated the Establishment Clause, ECF 1 ¶ 81, I will grant the Motion, without prejudice, for failure to state a claim.

In certain circumstances, "supervisory officials may be held liable ... for the constitutional injuries inflicted by their subordinates."  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994).  But, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676. Generally, the "determining issue … is whether defendant proximately caused a violation of the plaintiff's rights by doing something or failing to do something he should have done".  *Shaw*, 13 F.3d at 798-99.

"In order to succeed on a § 1983 claim for supervisory liability, a plaintiff must show" the following three elements, *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw*, 13 F.3d at 799) (alterations in *Wilkins*):

> (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

In *Wilkins*, the Fourth Circuit reiterated the *Shaw* Court's explication of the elements as follows, *Wilkins*, 751 F.3d at 226-227 (quoting *Shaw*, 13 F.3d at 799) (alterations in *Wilkins*) (citations omitted):

> As to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."  As to the second element, a plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses."  Finally, as to the third element, "proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains ... or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions."

Although Buxton faults all four defendants for "approv[ing] and uphold[ing]" Dougherty's decision, ECF 1 ¶ 79, Buxton's claims against Thomas and Martino fail at the threshold question of whether they supervised Dougherty or her decisions; nothing in the Complaint gives rise to an inference that they had any say in the matter whatsoever.  Buxton alleges that Thomas "serves as the Coordinator for Selective Admissions for the School of Health Professions," *id.* ¶ 13, and that she sent him two letters and an email informing him that he would not be admitted to the 2014 RTP. *Id.* ¶¶ 36, 38, 39.  Martino "serves as the Academic Advisor for the School of Health Professions," *id.* ¶ 12, and met with Buxton twice. *Id.* ¶¶ 26, 45.  At the first meeting, Martino apparently read Dougherty's 2013 evaluation of Buxton's candidacy to Buxton. *Id.* ¶¶ 26, 45.  At the second meeting, Buxton asked Martino to re-read the evaluation and to give him a copy.  Buxton complains that Martino refused to re-read the document and required Buxton to complete paperwork to obtain a copy of the document. *Id.* ¶¶ 45, 47.

None of this suggests that Thomas or Martino supervised Dougherty or had the power to change her decision. Indeed, given only the defendants' titles, it seems much more likely that Dougherty, who is "Director" of the RTP, supervised the work of Thomas, a "Coordinator" of admissions, and Martino, an academic "Advisor," than the other way around. Accordingly, Count II fails to state a claim against Thomas and Martino. *Shaw*, 13 F.3d at 798. I will dismiss those claims, but I will grant leave to amend.

With regard to Buxton's claims against Eustis and Kurtinitis, Buxton himself relies on a similar common-sense understanding of what titles mean in an administrative setting. In his Opposition, in support of his contention that his claims "against defendants Eustis and Kurtinitis may proceed under a theory of supervisory liability," ECF 20 at 19, Buxton argues, *id* at 20 n.9:

> The Complaint also makes clear that [Eustis and Kurtinitis] were in a position of authority regarding the operations of the Radiation Therapy Program. *See* Compl., ¶ 9 (alleging that Defendant Kurtinitis, as CCBC President, "is responsible for the conduct and operation of the college and for the administration and supervision of its departments"); *id*. at ¶ 10 (alleging that Defendant Eustis "serves as the Dean of Instruction for the School of Health Professions, including the Radiation Therapy Program, at CCBC").

Certainly, Buxton's claims against Eustis and Kurtinitis are stronger than his claims against Thomas and Martino. These defendants' titles, and the very thin descriptions of their duties, give rise to the *possibility* that they supervise Dougherty and have some power to change her admissions decisions. But, in my view, as in *Jenkins*, Buxton's "Captain of the Ship" argument is too tenuous to survive defendants' Motion. *See* 2015 WL 1285355, at *35. Even assuming that Eustis and Kurtinitis had power over Dougherty and her admissions decisions, the allegations still fail to show that the defendants were deliberately indifferent to, or tacitly authorized, a pervasive and unreasonable risk of unconstitutional action by Dougherty.

For example, the Complaint does not plausibly allege that Eustis was even aware of Dougherty's conduct.  The Complaint alleges that Buxton "contacted" Eustis "to discuss his denial for admittance to the [RTP]", that he told Eustis's secretary that "he believed he had not been accepted to the [RTP] for discriminatory reasons", and that he "never received a reply from Defendant Eustis."  ECF 1 ¶ 33.  And, as discussed above, Buxton alleges that Eustis placed a "Dean's Hold" on his account "because he protested Defendants' systematic, repeated violation of his rights".  *Id.* ¶ 79.  But, he does not allege that Eustis ever knew of any particular protest, nor does he allege that Eustis knew anything about Jenkins's concerns or Dougherty's actions regarding Jenkins's application.  Accordingly, it can hardly be said that the Complaint plausibly shows Eustis was aware of a pervasive and unreasonable risk of constitutional violations flowing from Dougherty's conduct.  *See Shaw*, 13 F.3d at 799.  I will dismiss the claim against Eustis, with leave to amend.

In contrast, the Complaint plausibly alleges that Kurtinitis was aware of the concerns of Buxton and Jenkins regarding Dougherty's actions before Buxton filed suit.  Surely, Kurtinitis was aware of Jenkins's concerns by April 2014, when she was named as a defendant in his suit.  ECF 1 ¶ 42.  And, in June 2014, through counsel, Buxton "contacted" Kurtinitis to inform her of "yet another incident of unconstitutional conduct involving an applicant to the [RTP]."  *Id.* ¶ 49; ECF 1-3 (Demand Letter addressed to Kurtinitis and Dougherty detailing relevant events).

Nonetheless, Buxton also fails to state a claim against Kurtinitis.  In sum, he alleges that Kurtinitis received letters from two concerned students; she forwarded these letters to CCBC's attorneys, who responded to the letters on behalf of CCBC; and she is the President of CCBC.  This is simply not enough to state a plausible claim against Kurtinitis for individual liability.

Notably, Buxton does not allege that Kurtinitis is individually responsible for instituting a policy condoning hostility to religion, or discrimination on the basis of religion.  To the contrary, Buxton alleges that CCBC has a nondiscrimination policy, ECF 1 ¶ 16 (quoting policy), and that Dougherty's actions violated that policy.  *Id.* ¶ 50; Demand Letter, ECF 1-3 at 5.  Buxton relies instead on a theory of deliberate indifference/ tacit authorization.  ECF 20 at 21.  He argues: "Kurtinitis's response to the confirmation of the use of an unconstitutional policy in the Radiation Therapy Program [*i.e.*, Buxton's Demand Letter] were [sic], without dispute, inadequate and demonstrative of tacit approval."  *Id.*  He correctly states:  "Courts have explained that 'a supervisor[y] official who responds reasonably to a known risk is not deliberately indifferent.'  *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001)."  ECF 20 at 21 (alteration added to correct quotation).  And then he asserts that Kurtinitis's response to the concerns of Jenkins and Buxton was unreasonable.  *Id.*

On the basis of the allegations before me, it appears that Kurtinitis's response to Buxton's letter was reasonable.  Again, Buxton alleges only that he and Jenkins sent her letters outlining their concerns, and that, in response, they received responses from CCBC's attorneys denying wrongdoing.  Buxton has included the response to his Demand Letter as an exhibit to his Complaint.  ECF 1-5 ("Response Letter").  The Response Letter stated, *inter alia*, *id.* at 1:

> This firm represents the Community College of Baltimore County in connection with your claims made on behalf of Dustin Buxton.  We have completed an investigation of the matter and determined that Mr. Buxton's claims are factually and legally baseless.  State bluntly, Mr. Buxton's non-selection for the [RTP] had nothing to do with religion.

In his Opposition, Buxton asserts:  "Kurtinitis … responded through counsel by flatly denying … that Mr. Buxton's denial of admission involved any wrongdoing."  ECF 20 at 21.  He does not allege that CCBC, at Kurtinitis's direction, did not actually investigate his claims.  He

simply argues that CCBC's conclusion, and by inference Kurtinitis's agreement with it, was incorrect.

Kurtinitis's conclusion may have been incorrect.  But, there is simply not enough in the Complaint to show plausibly that her error amounted to a constitutional violation.  The two, or possibly three, instances of unlawful conduct by Dougherty (*i.e.*, her decision not to admit Jenkins in 2013 and not to admit Buxton in 2013 and 2014), as alleged in the Complaint, do not show that Kurtinitis was faced with "a 'pervasive and unreasonable risk' of constitutional injury to citizens like plaintiff", *Shaw*, 13 F.3d at 799 (quoting *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)), or that she responded unreasonably to them, even if she did nothing more than forward them to counsel for investigation.  *See Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."), *cert. denied*, 529 U.S. 1067 (2000).

Accordingly, Buxton's claim against Kurtinitis in her individual capacity in Count II must be dismissed, for failure to state a claim.  But, I will grant leave to amend.

## C.  Count III

In Count III, Buxton alleges that all defendants violated the Equal Protection Clause by "denying him an interview [in 2014] and admission to the Program because of his religious beliefs and viewpoint", and that Eustis violated the Equal Protection Clause when she placed a "Dean's Hold" on his account.  ECF 1 ¶¶ 88, 74.  Defendants argue— in only one paragraph— that Count III must be dismissed because it "fails to allege any facts in support of a claim that [Buxton] was treated differently than similarly situated individuals on the basis of his religious beliefs", ECF 17-1 at 28, and because it is completely duplicative of Buxton's Free Speech claims.  *Id*. at 28-29.

With regard to defendants' first argument, plaintiff has sufficiently alleged facts showing that he was treated differently in the admissions process because of his faith-related statements in his interview.  As plaintiff points out in his Opposition, he alleges that he made faith-related statements in his interview, and that those statements negatively impacted his candidacy; it "stands to reason" that "applicants to the [RTP] who did not mention their religious beliefs in their interviews did not similarly have points deducted from their interview scores".  ECF 20 at 29.  Thus, plaintiff adequately alleges that he was treated differently on account of his faith-related statements.

With regard to defendants' second argument, plaintiff argues that Count III is not entirely duplicative, because, *inter alia*, the Equal Protection Clause commands the Court to apply strict scrutiny to his claims.  He urges that strict scrutiny applies both because he has alleged violations of a fundamental right and because "[r]eligion is an inherently suspect class".  ECF 20 at 28 (citation omitted) (alteration in original).

As an initial matter, I am not persuaded by plaintiff's one-sentence argument, ECF 20 at 28, that strict scrutiny applies here.  Generally, when a plaintiff alleges a violation of a fundamental right that is expressly protected by the Constitution, constitutional analysis proceeds within the bounds set by that express and more specific provision.  *See*, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 94-98 (1972) (applying First Amendment jurisprudence to challenge brought under Equal Protection Clause against ordinance exempting labor picketing from general ban on picketing near schools).

Further, although it has often been stated, in dicta, that "religion" is a suspect class subject to heightened scrutiny, *see Roller v. Gunn*, 107 F.3d 227, 233 (4th Cir. 1997) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)), to my knowledge neither the Supreme Court nor the Fourth Circuit has decided a case on that basis.  Indeed, plaintiff has not cited such a case.  Rather, where plaintiffs claim differential treatment based on their religion, religious beliefs, or exercise of those beliefs, courts analyze those claims pursuant to heightened standards under the Establishment or Free Exercise clauses, as appropriate.  *See*, *e.g.*, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 338-39 (1987) ("Appellees argue that § 702 offends equal protection principles by giving less protection to the employees of religious employers than to the employees of secular employers.[1] … In cases such as these, where a statute is neutral on its face and motivated by a permissible purpose of limiting governmental interference with the exercise of religion, we see no justification for applying strict scrutiny to a statute that passes the *Lemon*[4] test.").

For these reasons, it appears that Buxton's claims in Count III are *largely* duplicative of his claims under the First Amendment in Counts I and II.  However, in light of the parties' bare-bones arguments on this point, I decline to determine definitively the applicable legal standard at this stage in the litigation, on the basis of these arguments.  Moreover, because, in any event, the Equal Protection Clause independently requires that Dougherty establish a rational basis for her decision, it is clear that Count III is not *entirely* duplicative of Buxton's First Amendment claims.  *See*, *e.g.*, *Amos*, *supra*, 483 U.S. at 339 (declining to apply strict scrutiny, under Equal Protection Clause, to law that passes the *Lemon* test, but further determining that Congress had a

---

[4] *See Lemon v. Kurtzman*, 403 U.S. 602 (1971).

rational basis for law at issue, sufficient to survive equal protection challenge).  Defendants do not address this point.  Memo, ECF 17-1 at 28-29.

Accordingly, I will deny the Motion with respect to Buxton's claims in Count III against Dougherty, in her individual and official capacities, because, as discussed, Buxton plausibly alleges that Dougherty violated the Establishment Clause, which raises the inference that her actions lacked a rational basis.

However, I will grant the Motion with respect to Buxton's claims in Count III against the remaining defendants, essentially for the same reasons discussed above.  In sum, Buxton has not plausibly alleged that Martino and Thomas had any power to effect the decisions at issue, that Eustis was even aware of them, or that Kurtinitis acted unreasonably or irrationally.  And, Buxton has not plausibly alleged the Eustis was responsible for the Hold placed on his account.  Consequently, Buxton has not stated a claim that any of these defendants violated the Equal Protection Clause, as summarily alleged.  *See* ECF 1 ¶¶ 88, 74.  Therefore, I will dismiss the claims against them in their individual capacities, without prejudice.  And, I will dismiss the claims against them in their official capacities with prejudice, as they are duplicative of Buxton's claim against CCBC via Dougherty in her official capacity.

## Conclusion

For the foregoing reasons, I will grant plaintiff's Motion to File Sur-Reply (ECF 22), and I will grant in part and deny in part defendants' Motion (ECF 17).  A separate Order follows, consistent with this Memorandum.


Date: June 25, 2015                                   _____/s/_____
                                                      Ellen L. Hollander
                                                      United States District Judge